The next case on our calendar is United States v. Hernandez-Garcia. Ms. Hartzler, whenever you're ready, you can begin and please watch the clock. Thank you, Your Honor. Can you hear me okay? Okay. Thank you. Good morning. May it please the court. Cara Hartzler, Federal Defenders, on behalf of Hernandez-Garcia. There are two issues in this case. The first issue is whether the Marines' surveillance of Mr. Hernandez-Garcia violated the Posse Comitatus Act. And the second issue is whether the district court procedurally and substantively erred in conducting the Batson analysis. I'd like to actually start with the Batson issue and then shift to the Posse Comitatus issue. So first of all, the district court committed two procedural errors in conducting the Batson analysis. The government and we both agree that because the prosecutors gave facially race-neutral reasons, the first two Batson steps are moot and we can move directly to the third step. So under the third step, there are two procedural problems. And the most important and glaring problem is that most of the reasons that the district court cited were not reasons that the prosecutor actually gave for striking the jurors. So that's a huge problem because even the government admits that judges cannot come up with their own reasons and substitute those reasons for those of the prosecutor. The whole point of Batson is to analyze the prosecutor's reasons to determine whether or not those are protectual. And because here, at least five of the six reasons that the judge purported to rely on were the judge's own reasons, and only one of them was actually a reason the prosecutor had cited, that's procedural error that the entire analysis. The second procedural error is that the judge didn't create a clear record of its analysis. Essentially, all the judge did is just cite or identify several reasons that were, as I just mentioned, the judge's own reasons rather than the prosecutor's and didn't say, you know, why the judge was saying that these pose discrimination, did not do a comparative juror analysis. At a minimum, Batson requires that judges take a sensitive inquiry into the prosecutor's reasons and evaluate them meaningfully. But here we don't have any sort of explanation. And at a minimum, in recent cases where this court has found that a judge below didn't create a clear record, that in itself is error under Batson. So those are the two procedural errors. Can we then just, you know, I think clearly the district court judge misspoke at times, and you know, I think there's, we recognize we're leaning on that when, you know, judges or lawyers speak in open court, and there are many facts being floated around that sometimes people don't say things absolutely accurately. And I think that's the case here, at the very least. So can we just do a DeNovo review here, based on what we see on the record, rather than a clear error? Yes, and that's exactly actually what the court did in a case recently. It's an unpublished case, but it's called Hitzman. It's cited in our brief, and the court said that because there's no clear record on why the district court made the decision it did at step three of Batson, that the court can proceed to do a DeNovo review under step three. Can you address that, why under DeNovo review? There was a Batson issue here. Sure, so moving to the substantive sort of step three analysis, let's start with the numbers. So first of all, the prosecutors used three of their seven strikes against two Asian-American jurors. Actually, used three of their seven strikes against Asian-American jurors. We are challenging two of those strikes. We don't necessarily challenge the third. And of the panel members, basically the government struck three out of four or five Asian-American jurors. That's either 60 or 75 percent of the Asian-American jurors that were on the panel. By contrast, the government only struck 16 percent of Hispanic jurors and 10 percent of white jurors. So the percentage of Asian-American jurors struck was much, much higher, about at least three or four times higher than any other group. And then if you look at the fact that there are no Asian-Americans that were ultimately seated on the juries, that was also a consideration that this court has looked at under step three of Batson. So moving then to the two particular jurors and their characteristics. I'll start with Ms. Del Rosario. The government cited two reasons for striking her. First of all, it said that she was a research scientist and they didn't like that. The problem is that the government, during voir dire, essentially said to the jury openly, looks like we have a lot of engineers on this panel. And I'm concerned that engineers might not take circumstantial evidence into account as much as they should because they have sort of these logical technical minds. So presumably that was the idea behind the because she was a research scientist. The problem is that there were eight other jurors who had science and tech and engineering backgrounds on the jury panel that the government did not strike. Five of those jurors ultimately went on to serve on the jury. So under a comparative juror analysis, there is no the government's reasons are belied by the actual people that it struck. Did the prosecutor also mention that she had served on a hung jury? So if you combine the two, hung jury and a research scientist slash technical background, I mean, I don't know if there were any other jurors that had both those characteristics. There were no jurors that had both of those characteristics. However, the court has been very clear that we don't have to prove that all that there were two identical jurors, one of whom was struck and one who one of whom wasn't. For instance, the court has said that where half of the government strikes were pretextual. That's enough. And in fact, in the recent case before the Supreme Court of Flowers v. Mississippi, the court specifically discounted the idea that we have to find an identically situated juror. So the court's case law and Supreme Court case law just doesn't support that. But I would also point out that as to the hung juror issue, there were three other jurors who did not strike that were also on hung juries. And in fact, two of those three jurors had been only on hung juries, whereas Ms. Del Rosario had served on both a jury that reached a verdict and a jury that didn't. In other words, Ms. Del Rosario actually had proven that she was more capable of reaching a verdict than two of the non-Asian American jurors that the prosecutors didn't strike. So because of that, both of the government's reasons for striking Ms. Del Rosario were pretextual. I guess, you know, both those reasons seem to be a pretty good reason if you're a prosecutor to maybe not see the juror. You know, someone who's maybe highly technical, maybe too technical about certain things, and someone who's been on a hung jury may be the same. It's not, you know, maybe arguably stronger if one of the reasons seem dubious, like in our prior case about, you know, a postal carrier. But I guess here both reasons seem to be pretty strong reasons for a prosecutor to say, you know, I may not want this person to be a juror. And they're absolutely reasons that would survive step two. The problem is that we're at step three. And at step three, we have all this information about all the other jurors that had those same characteristics that the government did not strike. I'll give you another example, Your Honor. For Mr. Sankey, basically the government also cited his profession. He was a software developer. But there were at least five other jurors who were in science and tech and engineering who came up earlier in the jury panel that the government did not strike. So if you're the government and... But counsel, with respect to Mr. Sankey, I mean, there were other reasons cited by the prosecution for striking him, were there not? I mean, they were, if I have this right, they were concerned about that he might be a bit of a loner. Because of that, to participate in the process requires unanimity. It might be more difficult for him to do that. And so, and that's, if you have that concern, that's harder to subject to the kind of comparative analysis that you can do with respect to other jurors. They have similar professions. Isn't that a legitimate consideration? You further have to know, I worry about how this juror is going to be able to participate in the jury process. That strikes me as quite legitimate. It could be, Your Honor. The problem is, in other cases where the prosecution has cited being a loner as the reason, they actually pointed to evidence in the record. For instance, this juror doesn't seem to be making eye contact. He's not interacting with other jurors. He didn't laugh at socially appropriate times. Here, there was absolutely no evidence that either the prosecutor or the judge cited to support that statement. The only thing that they said to support the loner theory is that he spoke less during his allocution. But the problem is that when, if you actually look at the length of time that he spoke, it was longer than at least five other jurors. So again, that doesn't hold up. In any case, Your Honor, I do want to spend some time on the Posse Comitatus Act. And I would also just say, I believe that there was procedural error at a minimum that this court could remand for the district court to make the decision on that. Shifting to the Posse Comitatus issue. Essentially, the purpose of Posse Comitatus is that we don't want the military to be used as a domestic police force. And here, in 10 U.S.C. 274 B2B, Congress specifically looked at the Posse Comitatus Act in combination with 1326, illegal reentry. And it said, we only want to allow the military to be used for surveillance purposes, for purposes of 1326 prosecutions, if the military sees the person when they're first outside of the United States, and then follows them, but no further than 25 miles into the United States. In other words, we know exactly how Congress wanted the Posse Comitatus Act and 1326 to interact. Now, the government is citing the 2006 National Defense Authorization Act and saying that very vague language about, quote, securing the southern border is enough to overcome that very specific statutory language linking 1326 and the Posse Comitatus Act. But the better way to analyze those is to say, look, 274 B2B applies for 1326. And the securing the southern border language in the NDAA applies for purposes of the military can be used to surveil people, and that can be used for civil deportations. You could have border patrol who would still do surveillance, and then that could be used to civilly deport or criminally prosecute people. Or you could use military surveillance of people who are first spotted outside the United States. But here, the price of using the military, the benefits of using the military resources, is that we're not going to step on Congress's toes and just nullify the language that they have in 274 B2B that only allows those military resources to be used when the person is not criminally prosecuted. And that's essentially our argument. So I would open the floor to any questions from the panel. Yes, counsel, can you explain to me what the resources were here that were used that were improper? Yes, Your Honor, the Marines basically had scope operators, surveillance. We had infrared technology, and they would look across parts of the desert and try to, you know, see people who were near the border. They were doing that in their capacity as military observers? They were doing that as part of a program started by the Defense Department, and I believe it was in 2018. And that program is still going on. It has been extended through at least the end of 2022. I would like to save some time for rebuttal. But they weren't doing anything out of the ordinary when they observed this person? They were basically doing their normal job, which was to do surveillance. That's correct. I'll save the remainder of my time if that's all right. Please, the court, Daniel Zip on behalf of the United States. Your Honor, on the Posse Comitatus Act, just to be clear, we're not relying on vague language in the 2016 NDAA to say that the activities here were authorized. What we're relying on is a specific subsection of that statute entitled types of assistance authorized that then lists precisely the behavior of the Marines in this case. It is to deploy to the southern land border, to deploy manned aircraft, unmanned aerial surveillance system, or ground-based surveillance systems to support the continuous surveillance of the southern land border. And that is specifically to aid one federal agency, the Customs of Border Protection. So the language in that statute is very clear, and it directly tracks what the Marines were doing. So the fact that securing the border allows the military to do whatever it wants around the border is not our argument. All we're saying is very straightforward. The Posse Comitatus Act and 275, which applies it to the Navy and the Marines, specifically say that the statute is not violated if the activities are otherwise authorized by law. And Congress made it very clear that these specific actions are authorized by law. So with that, the district court found that the activities here did not violate the Posse Comitatus Act and denied the motion. Defense counsel, counsel, I asked this with some trepidation because there are so many moving parts here. I may have the statutes confused, but it seems to me that there's, you have, I'm referring to 284B6, which seems by its, and this is the, this provision talks about the initial detection occurring outside of the boundary. I mean, it seems to talk about efforts by the military. It relates to the criminal prosecutions, which we were, that we're dealing with here. And it talks about surface traffic, which is what we're dealing with here. I guess what I'm trying to say is in its specificity, it seems to address the very circumstances that we're talking about here. So why shouldn't we take the view that this statute with its limitation to surface activities that has to take place within the boundary? Why doesn't that control? It's the specificity of that, that I find somewhat striking. Yeah, sure, Your Honor. This is what control, that's what I'm trying to say. Right. So that 274B was passed in 1981 as part of the National Defense Authorization Act of that year. There's no reason that 40 years later, Congress can't pass another statute that carves out a specific type of surveillance in a specific area for assistance to a specific federal agency that's different than what their original 1981 statute was. It's still authorized by law under the clear 2016 language. Defense counsel relies on this sort of canon of general canon. But this court's case law is clear that that canon doesn't carry the day when the original statute is general in some respects and specific in others. And the new statute is also general in some respects and specific in others. Here, as Your Honor pointed out, the first statute does make reference to criminal violations, which is more specific. But the new statute is much more specific on the facts at issue in this case. Like I said, whereas the first statute allows assistance to any federal, state, or local law enforcement agency, this one's limited to CBP. While the first one is applicable to any border of the United States, the newer one is limited to the southern land border. And while the first one just deals with the operation of equipment for surveillance, the new statute in 2016, specifically talks about technology that wasn't even in existence in 1981, like unmanned aerial surveillance, and ground based surveillance systems. So that that general specific canon isn't enough to say that that we have to just set aside what Congress said in its clear language in 2016, and only go with the 1981 statute. With a plain language of the new statute, it's not enough to say that the Marines were doing here and that the court properly denied the motion on those grounds. Unless the court has further questions on the posse comitatus, I'm happy to move on to the Batson issue. On that issue, Judge Lee noted, and I think it's correct, that this court could conduct its own de novo review, do a comparative juror analysis. We would ask that the court apply clear air standard to the district court's findings in this case. I think in the cases where this court has sort of thrown up its hands and done its own analysis, are cases where the district court either made no findings at step three, and said nothing at all, or said things that were ambiguous, you know, discussing the prosecutor statements as plausible. In this case, admittedly, the district court wasn't perfect. Its language was a little bit ambiguous at times. But if you look at the totality of what it said, it's clear that it was listening to the prosecutor statements, and it was making a step three determination that there was no purposeful counsel. Respectfully, I mean, I don't know how you can avoid the conclusion that the district court judge here really did not understand how the Batson analysis works. I mean, he, in effect, in sort of doing maybe a step three analysis, he applied it to step one, he's very explicit in saying there's no prima facie case here. And so he didn't really understand what it I think what it means to to establish a prima facie case. He asked for reasons. And then, without going to step three at all, just said, Well, I think those reasons are okay. I mean, I don't see that how you can, in any way defend the argument that he understood how the Batson analysis works here. Well, Your Honor, you know, this is an experienced district court judge. And I think what the prosecutor offered his statements, the court then considered those statements and went through each of the three reasons and found no illegitimate basis being employed here, or that it was satisfied that that was a and then immediately after that, when the prosecutor prompted, Are you finding no purposeful discrimination here? Admittedly, there was the court didn't just respond, Yes, it's it referred back to its initial prima facie finding, but then said, There's no discrimination here. So to the extent that this court is concerned that the step three finding was insufficient, the idea that this court would remand back to the district court for a finding as to whether there was purposeful discrimination, when the court was asked that very specific question and responded, There's no discrimination here, it would make little sense to send it back on a procedural matter as to the step three finding. It shouldn't maybe we do a de novo review ourselves here without remanding because it's not you know, I get we're leaning with what people say in court. People might not say things accurately. But here, there's many, many, it seems like errors here in terms of what the what the judge said in terms of initially suggesting step one to the step three, then in articulating the factors for the two of the jurors, seems like the judge misspoke. So given that, I mean, shouldn't we at least at the very least do a de novo review? Your Honor, I think there's significant downsides to just jettisoning what the district court found in this case, as this district, this court has recognized many times that the district court is in a unique position and that it has, as this court set a first row seat in the orchestra to gauge the demeanor of the jurors to gauge the credibility of the prosecutors themselves when they're offering the statement. So I think it's powerful that the court heard firsthand observed the prosecutors and found that there was no discrimination here. So that we would, it's our position that this court should not set aside the jurors. And if it does, which it seems everyone is inclined to do, I think even on the de novo review standard, the defense has not met their burden in this case of showing that the prosecutor's reasons for striking these two jurors were merely pretext for discrimination against Asians. As to the first juror, Ms. Del Rosario, as the court noted, she indicated that she had been on a hung jury, and she stated that she was a research scientist. That profession is one that the prosecutor addressed when he was conducting his own voir dire and expressed concern that individuals in a technical field might have difficulty with circumstantial evidence. And the idea that someone has been on a hung jury in the past is recognized as a legitimate reason. So there are no other jurors that share both of those characteristics. And even on the cold record, there's nothing here to suggest that those two reasons were somehow pretextual for discrimination. Counsel, if we do a de novo analysis, would you agree that at the appellate level, it's particularly important for the court to do a kind of comparative juror analysis that we should look very carefully at whether there are other jurors who may have had many of the same qualities that are cited in striking the jurors, and yet were not struck. Would you agree that we should do that kind of comparative analysis, particularly on appeal? Yes, Your Honor. On appeal, certainly, this court has recognized many times that that is a useful tool for analyzing claims of discrimination. I think my opponent has argued that the district court was required to engage in a juror analysis. The law is equally clear that that's not the case, that at the time, the district court can simply hear the reasons from the prosecutor, gauge his credibility, and make a determination based on those findings. You know, as a practical matter, it would be very difficult to do a comparative juror analysis at the time that the parties are doing jury selection, given that we wouldn't have transcripts, we wouldn't be able to immediately cross-reference all the reasons given by all the jurors and sort of create the Venn diagrams and all the things that we would do on appeal. But to your question whether this court can and should use a comparative juror analysis, certainly that is something that this court has indicated many times is useful. But even applying that even to the cold record here, there's not enough to show that this was a pretense or a mere pretextual reasons to cover discrimination against Asians. Well, aren't there a bunch of jurors who were seated who had not precisely the same scientific background, but who had scientific backgrounds that were comparable, who might have raised the same concerns, and yet they were not the subject of challenge on that basis. Doesn't that comparative analysis make your task more difficult in defending what happened here? Well, Your Honor, I think that the fact that the prosecutor indicated some job doesn't mean that every single person who had a technical job of any kind had to be struck. And to not do that shows discrimination. And these were a range of jobs from research scientist to software developer to sort of IT people. And more fundamentally, the fact that in balancing the various factors that each juror had, that a technical field in combination with other things that made them a technical field plus prior service on a hung jury, which were in combined, was the basis for striking the first juror here, and which no other jurors struck under comparative juror analysis shared. And the same with the second juror as well, the prosecutor noted that he was underdressed, that he was wearing a hoodie, that he appeared to be a loner. Again, these are sort of subjective observations where the district court is in the best position to sort of credit whether those are actual pretextual or not. But even on the record as it stands here, there was no other jurors that shared that combination of informal dress, lack of, you know, no spouse or no children, and a short answer, all of which showed to the prosecutor that this was someone who might not be up to the very serious task of going back in the deliberation room with 11 others and sitting in judgment of another person in a criminal case. So even if this court were to engage in de novo review, it's our position that the defense has not met their burden of showing that the strikes of these two jurors were pretextual. Unless the court has any further questions, I see my time is almost up. Thank you, Your Honor. Just a brief note on the Batson issue. I agree with the government. I think the judge here was rushed. I think the jury was waiting. They were trying to get through a trial in a shorter period of time. And I think that affected the lack of analysis and some of the legal errors in terms of prima facie versus step three. And so given that the court seems to agree that there were some procedural errors, perhaps the best thing is to just remand and have the district court give the district court to do over. But even if this court does go to a de novo review, we believe that under the comparative juror analysis, all of the prosecutor's reasons either don't hold up because they also apply to other jurors, or they do not relate to the particular case to be tried, which this court said in the en banc decision in Casper v. Canberra is part of the analysis. Just moving very quickly to the posse comitatis. If Congress had come in the NDAA in 2016 and said that we now want the military to be able to use their resources for criminal prosecution, that would end this. We wouldn't be here. But the problem is that Congress didn't do that. Congress only said secure the border. And if we were writing on a blank slate, perhaps you could say secure the border means criminal and civil. But we aren't writing on a blank slate. We have a clear message from Congress that they wanted the posse comitatis act to only apply in certain circumstances when it's used for criminal prosecutions and particularly 1326 prosecutions. And there's simply not enough here to step on Congress's toes by saying that the very vague and general language that doesn't say whether it's civil or statute saying that this cannot be used for criminal purposes. And while the government tries to say that there are several ways that it is more specific, it the government is specifically talking about, well, it refers to equipment. The problem is equipment is really not the issue here. So I see that I'm out of time. And with that, I will submit the argument. Thank you. Thank you.
judges: SCHROEDER, Lipez, LEE